**CAROL A. SOBEL** SBN 84483
**MONIQUE A. ALARCON** SBN 311650
725 Arizona Avenue, Suite 300
Santa Monica, CA 9040
t. 310.393.3055
e. carolsobel@aol.com
e. monique.alarcon8@gmail.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| REBECCA COOLEY, BENJAMIN HUBERT AND CASIMIR ZARODA, individually and on behalf of a class of similarly situated persons,<br><br>Plaintiffs,<br><br>v.<br><br>The CITY OF LOS ANGELES, a municipal entity; DOES 1-10,<br><br>Defendants. | Case No.: 2:18-cv-09053-CAS-PLA<br><br>First Amended Complaint<br>(filed with leave of Court) |

1
FIRST AMENDED COMPLAINT

## JURISDICTION AND VENUE

1.      This is an action for declaratory relief and damages pursuant to 42 U.S.C. § 1983 based upon the violations of Plaintiffs' rights under the Fourth and Fourteenth Amendments to the United States Constitution and analogous California constitutional and statutory law.  Jurisdiction exists pursuant to 28 U.S.C. § 1331 and 1343 based on questions of federal constitutional law and 42 U.S.C. § 1983.  Jurisdiction also exists under the Declaratory Judgment Act, 28 U.S.C. §§ 2201(a) and 2202.  This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367, as it arises from the same case or controversy as Plaintiffs' federal claims.

2.      Venue is proper in the Central District of California pursuant to 28 U.S.C. §1391(b) as all parties reside in the Central District and the events and conduct complained of herein all occurred in the Central District.

## PRELIMINARY STATEMENT

3.      In 2012, the Ninth Circuit upheld a preliminary injunction in *Lavan v. City of Los Angeles*, 693 F.3d 1022 (9th Cir. 2012), 133 S. Ct. 2855 (2013) cert denied.  *Lavan* challenged the enforcement of LAMC § 56.11, proscribing the placement of any personal property on public property.  *Lavan v. City of Los Angeles*, 797 F. Supp. 2d 1005 (C.D. Cal. 2011).  In *Lavan*, the district court enjoined the City from seizing property of unhoused individuals when the property is momentarily unattended but not reasonably believed to be abandoned, while permitting seizure when the property is evidence of a crime or creates an immediate public hazard without complying with due process notice requirements. The injunction also barred the City from summarily destroying seized property and ordered the City to store the property for 90 days, consistent with state law, underscoring the need for procedural due process both before and after the seizure. In affirming the rights of the plaintiffs in *Lavan*, the Ninth Circuit underscored that the "simple rule [i.e. notice and an opportunity to be heard by an impartial tribunal]

2
FIRST AMENDED COMPLAINT

holds whether the property in question is an Escalade or a [tent], a Cadillac or a cart." 693 F. 3d at 1032 (emphasis in original).

4.     Again in 2016, the City of Los Angeles was enjoined by another District Court for engaging in similar conduct, seizing the property of homeless individuals. See *Mitchell v. City of Los Angeles*, No. 16-cv-01750 SJO (GJSx) (C.D. Cal. 2016) [Dkt. 51 (Apr. 13, 2016)].

5.     Despite these directives from the federal courts protecting the property of unhoused individuals forced to live on city streets because of the lack of alternative shelter, the City, once again, seized personal property and destroyed it without an opportunity for the rightful owners to reclaim it.

<u>**PARTIES**</u>

**PLAINTIFFS:**

**Rebecca Cooley**

6.     Plaintiff **REBECCA COOLEY** is an individual who is disabled and, at the time of these events, was residing on the streets of the City of Los Angeles. In 2017, she suffered from Crohn's disease, celiac disease, and a hernia.  Ms. **COOLEY** became homeless after undergoing three surgeries to treat complications with her Crohn's disease.   The continuing effects of her medical disability necessitate special nutritional supplements.  Without these supplements, her condition is exacerbated. Prior to these surgeries, Ms. **COOLEY** was employed as a manager at Nordstrom.  The effects of Crohn's disease and the surgeries make her unable to maintain her employment.  She became homeless when her medical expenses left her and her husband unable to afford rent.

7.     Ms. **COOLEY** is married to Plaintiff **BENJAMIN HUBERT** and she relies heavily on her husband for care.  Her sole source of income is government aid in the form of $221 per month from General Relief.  She cannot afford housing in the City.  At the time of the incident giving rise to this Action, she could not locate an available shelter placement that would accommodate her disability and

FIRST AMENDED COMPLAINT

allow her husband to stay with her and provide physical assistance.  As a result, Plaintiffs **COOLEY** and **HUBERT** had no alternative but to stay on the streets.

8.     Plaintiffs COOLEY and HUBERT are currently receiving services and staying at an Adult Residential Facility, where  Ms. **COOLEY** receives medical services and mental health care.  Ms. **COOLEY** has applied for and is hopeful that she and her husband will soon secure permanent supportive housing.

9.     In September 2017, Ms. **COOLEY** was living on the sidewalk at 3rd Avenue and Rose in the Venice neighborhood in the City of Los Angeles.  On or about September 15, 2017, most of her belongings were confiscated and summarily destroyed by the Defendant City's agents and employees in a sanitation sweep of the block where she stayed. Ms. **COOLEY** maintains that she never saw a notice of the intended sanitation event and that, in the past, when she saw such signs, she complied and removed her property to a safe distance.  Ms. **COOLEY** sues on behalf of herself and other similarly situated individuals.

**Benjamin Hubert**

10.     Plaintiff **BENJAMIN HUBERT** is an individual who, at the time of these events, was residing on the streets of the City of Los Angeles.  After his wife, Plaintiff **REBECCA COOLEY**, could no longer work because of her disabilities, he became the sole wage earner.  He lost his job after missing work to attend to Ms. **COOLEY**'s medical emergencies.   His sole source of income is $221 a month in government aid in the form of General Relief.  Even combined with the $221 a month his wife receives, he cannot afford housing in the City.

11.     In September 2017, Mr. **HUBERT** was living on the sidewalk at 3rd & Rose in the Venice neighborhood in the City of Los Angeles.  On or about September 15, 2017, most of Mr. **HUBERT**'s belongings were confiscated and summarily destroyed by the Defendant City's agents and employees.  Mr. **HUBERT** maintains that he never saw a notice of the intended sanitation event and that, in the past, when he saw such signs, he complied and removed his

property to a safe distance.  Mr. **HUBERT** sues on behalf of himself and other similarly situated individuals.

**Casimir Zaroda**

12.     Plaintiff **CASIMIR ZARODA** is an unsheltered individual who resides on the streets of the City of Los Angeles in the Venice neighborhood.  He became homeless during the 2008 economic downturn when he was unable to make a living wage, despite being employed.  After Mr. **ZARODA** was evicted from his apartment in Sonoma County, he began living at a shelter while still working and taking on a second job in petition canvassing to make extra income. While living at the shelter, Mr. **ZARODA** set aside 80% of his income to try to save enough money to secure permanent housing again.  He stayed at the shelter for six months, but it quickly became difficult to maintain employment while living there.  Mr. **ZARODA** relied on public transportation to get to work, but if he missed the bus or it was late, he could not get to work on time.  He suffered sleep deprivation because of the environment at the shelter.  Ultimately, the lack of sleep interfered with his job performance and, together with the economic recession impact, caused him to be laid off.

13.     After losing his job, Mr. **ZARODA** searched for similar employment opportunities and found opportunities in Los Angeles.  With the money he saved while living at the shelter, he moved to Los Angeles.  He got a job and lived in motels but could not make a living wage to afford a place to live.

14.     Currently, Mr. **ZARODA**'s sole source of income is government aid in the form of General Relief of $221 per month.  In the past, he participated in the General Relief Opportunities for Work (GROW) program and tried to secure employment again but being unsheltered presented impediments.  As a consequence of living on the streets for several years Mr. **ZARODA** now suffers from psychological disabilities.  He has applied for subsidized housing and is currently on the Section 8 housing waitlist.

FIRST AMENDED COMPLAINT

15.    In September 2017, Mr. **ZARODA** was living on the sidewalk at 3rd & Rose in the City of Los Angeles.  On or about September 15, 2017, most of his belongings were confiscated and summarily destroyed by the Defendant City's agents and employees.  Mr. **ZARODA** maintains that he never saw a notice of the intended sanitation event and that, in the past, when he saw such signs, he complied and removed his property to a safe distance.  Despite not seeing a prior notice posted, when he observed the arrival of the sanitation trucks at his location on the morning of September 15, 2017, he packed up his property and moved it to Rose Avenue, as was his practice for prior sanitation events on the street.  In the past, Mr. **ZARODA** had never observed the City remove property on Rose.  Mr. **ZARODA** sues on behalf of himself and other similarly situated individuals.

**DEFENDANTS:**

16.    Defendant **CITY OF LOS ANGELES** ("**CITY**") is a municipal entity organized under the laws of the State of California with the capacity to sue and be sued.  The **CITY**'s liability is based in whole or in part upon California Government Code §§ 815.2 and § 920, Civil Code §§ 43, 51, 51.7, and 52.1 and respondeat superior.  Liability under federal law is based upon 42 U.S.C. § 1983.  The acts complained of herein were all done by agents and employees of the City of Los Angeles assigned to, or contracted by, the Los Angeles Police Department (LAPD), the Department of Public Works, and the Bureau of Sanitation.

17.    The Defendant **CITY**, its employees and agents, participated personally in the unlawful conduct challenged herein and, to the extent that they did not personally participate, authorized, acquiesced, set in motion, or otherwise failed to take necessary steps to prevent the acts that resulted in the unlawful conduct and the harm suffered by Plaintiffs.  Each acted in concert with each other.  The challenged acts caused the violation of Plaintiffs' rights.

18.    The identities and capacities of Defendants **DOES 1 through 10** are presently unknown to Plaintiffs, and on this basis, Plaintiffs sue these Defendants by fictitious names.  Plaintiffs will amend the Complaint to substitute the true names and capacities of the DOE Defendants when ascertained.  Plaintiffs are informed, believe, and thereon alleges that DOES 1 through 10 are, and were at all times relevant to this complaint, employees and/or agents of the Defendant **CITY OF LOS ANGELES** and are responsible for the acts and omissions complained of herein.  They are sued in both their official and individual capacities.

## FACTS

19.    On the morning of September 15, 2017, employees of the **CITY OF LOS ANGELES** arrived at the area of 3rd Avenue and Rose Avenue in the Venice neighborhood of Los Angeles.  City employees began an "area cleaning" of the sidewalks where unhoused individuals usually reside.

20.    Consistently, for over two years, the Defendant **CITY** would post signs to provide three-days notice of the area cleanings.  On information and belief, the **CITY** frequently did not perform area cleanings on the dates listed in the notices.  The signs would remain posted long after a cleaning date passed, resulting in confusion for the residents of 3rd and Rose Avenues.  Further, the signs did not then, and do not now, indicate specific streets that will be closed off and cleaned.  Instead, the signs simply say that the targeted zone is "in this area."

21.    On information and belief, Plaintiffs allege that Defendant City maintains that the same notice was posted over a broad area of Venice, covering a distance of more than a mile in length and from 3rd to the beach. The Notice did not distinguish times at different locations for the clean up.  As a result, Plaintiffs were effectively barred from having their property anywhere in the targeted area starting at 8:00 a.m., with no time end.  Previously, Plaintiffs were always allowed to pack up their belongings and move their property temporarily to Rose Avenue while the cleaning on 3rd Avenue took place.  With an area of several square miles

7

FIRST AMENDED COMPLAINT

targeted at the same time, there was and is no place where Plaintiffs could or can safely move their property without risking seizure and immediate destruction.

22.     Plaintiffs allege that the sweep on September 15, 2017 was not noticed and that it had been several weeks since the City last conducted an "area cleaning" in the location of 3rd and Rose Avenues.  Prior to the September 15th sweep, LAPD officers told individuals on 3rd that no clean-ups would occur in the near future due to a lack of resources.

23.     There were approximately 60 unhoused individuals staying on 3rd Avenue at the time of the September 15, 2017 incident.  That morning, some individuals went to work, others went to get food, and many left for services and other appointments.  Before leaving, most people broke down their tents, gathered their belongings, neatly tucked them under wrapped up tarps and blankets, and stored them against the wall on the sidewalk at 3rd Avenue.

24.     Out of an abundance of caution and past experience, some individuals, like Plaintiff **ZARODA**, moved their property to Rose Avenue before leaving the area.  Mr. **ZARODA** had seen **CITY** employees destroy property of unhoused persons approximately ten to fifteen times before in both the Venice area and in the Downtown Los Angeles area and, as a result, he regularly moved his property to Rose, where he believed it would be safe.

25.     Plaintiff **ZARODA** bundled his belongings neatly and wrapped them with a tarp and bungee cords in a way that showed it was not trash nor abandoned. While he was doing this, he observed a convoy of Public Works employees and LAPD officers drive past the intersection of 3rd and Rose.  When he left for breakfast, he observed the City employees parked at the intersection of Lincoln and Rose.  On information and belief, at approximately 11:00 AM, City employees began closing off 3rd Avenue with yellow "caution" tape.  Unlike in the past, they also closed off Rose Avenue, from 3rd Avenue to Hampton, the precise area where some Plaintiffs—like Mr. **ZARODA**—had moved their property.  When Mr.

**ZARODA** returned to 3rd and Rose, the unhoused residents of that area were behind the yellow tape, prevented from entering the area by LAPD officers, and watching as their property was summarily destroyed.

26.     On the date in question, Plaintiffs **COOLEY** and **HUBERT** left their property on 3rd while they went to eat breakfast at Bread and Roses Café, run by St. Joseph's Center.  When they returned to 3rd Avenue, City employees were throwing away all personal belongings that were on the sidewalk.  When Ms. **COOLEY** and Mr. **HUBERT** attempted to retrieve their items, LAPD officers told them they would only be permitted to enter the taped-off area to retrieve what they could carry in one trip.  Ms. **COOLEY** explained that, because of her disability and physical limitations, she could not carry any heavy items and needed her husband to take some essential items for her, including her bike, sleeping bag, medically necessary nutritional supplements, and a tent.  LAPD officers refused to accommodate Ms. **COOLEY**.  Then Ms. **COOLEY** again told officers that she needed help to carry her property and showed LAPD officers her hernia to prove that she could not carry a 60-gallon bag of her property in one trip.  Despite LAPD officers refused to accommodate her needs and then told Mr. **HUBERT** that he could only carry what he could fit in a single 60-gallon trash bag.  LAPD officers then took the trash bag they had previously provided to Ms. **COOLEY**.

27.     Limited to a single 60-gallon trash bag between them, neither she nor her husband were able to take the majority of their essential property, including essential items such as a sleeping bag and most of her medically-required nutritional supplements.

28.     Mr. **HUBERT** moved their salvaged property to Rose Avenue.  When he tried to move both their fully operable bicycles at once, he was initially stopped from doing so by an LAPD officer.  Only after pleading with a different LAPD officer was Mr. **HUBERT** permitted to save both bikes.

29.     Following the directives of the LAPD, Plaintiffs COOLEY and HUBERT moved their salvaged property to Rose Avenue, as did other unhoused individuals on 3rd Avenue, and neatly stored it on the sidewalk at Rose Avenue. After they did so, LAPD officers put up yellow "caution" tape and closed off access to Rose Avenue.

30.     The police formed a line in front of the "caution" tape on Rose Avenue.  LAPD officers ordered Plaintiffs to leave the area or be arrested. Several Plaintiffs, including Mr. **ZARODA**, were permitted to retrieve a few items on Rose but barred from taking other property, ordered to get behind the caution tape and threatened with arrest if they persisted in trying to save their property.

31.     Plaintiff **COOLEY** watched in dismay as Public Works employees, with the aid of LAPD, began to summarily destroy property on Rose Avenue by throwing it into a large trash truck with a garbage compressor.  This was done despite Plaintiffs' objections and with the City employees' knowledge that the property was not trash nor abandoned.

32.     She asked LAPD officers to let her retrieve the medically necessary nutritional supplements that her husband had moved from 3rd Avenue earlier.  Ms. **COOLEY** specifically informed the officers that she needed the items because of her medical condition.   In response, an LAPD officer informed her that she would be arrested if she did not move back and away from the area, while another officer, observing the exchange between Ms. **COOLEY** and the first officer threatened to pepper spray her if she didn't step back and do what she was told.

33.     Ms. **COOLEY** observed another unhoused person attempt to help a severely disabled individual pull property on a bike from behind the caution tape. At the time, Ms. Cooley was close enough to hear the exchange as well as observe the woman and the police. She observed LAPD officers force the woman to the ground, threaten her with OC spray and handcuff her.

34.     In addition to clothes and other personal items, Mr. **ZARODA** lost essential property, including documentation he needed to verify that he received health insurance from the County of Los Angeles and his transit pass.  His transit pass was worth ninety-six dollars in discounted bus fares.  Mr. Zaroda understood he could not replace the transit pass until the next six-month period, when he could apply for the pass again.

35.     Plaintiffs **COOLEY** and **HUBERT** were left with only their bicycles, the backpacks they were carrying with a few personal items, and one sleeping bag for the two of them.  A bike trailer used to transport their belongings during the day, two new tents and a sleeping bag, clothes, medically-necessary nutritional supplements and essential paperwork were all destroyed.

36.     The loss of these items created a significant hardship for Plaintiffs.  They had to find donated blankets, tents, and sleeping bags to protect them from the elements at night or use their meager income to replace their tents and sleeping bags.  They observed others had to sleep on cardboard that night, with no protection from the elements.  The money to replace the blankets, tents and sleeping bags was money that was then not available to buy food.

37.     Despite observing the mass destruction of their property, some or all of the Plaintiffs made inquiry about recovering property and were provided an address on Towne Avenue to contact.  The location on Towne, then the only location the **CITY** maintained for storage of the personal property of unsheltered individuals seized during street cleanings, is more than 20 miles from the Venice location at issue in this Action.  For some like Plaintiff **ZARODA**, whose transit pass was seized and destroyed, it was inaccessible. At best, the trip was one and one-half hours one way on public transportation.  Even if he could retrieve his property, it would be difficult, if not impossible, for him to transport it back to Venice on public transportation.  For medically disabled persons such at Plaintiff **COOLEY**, the location in downtown Los Angeles was equally inaccessible.

## MONELL ALLEGATIONS

38.    Based upon the principles set forth in *Monell v. New York City Department of Social Services*, 436 U.S. 658 (1978), the **CITY** is liable for all injuries sustained by Plaintiffs as set forth herein. The Defendant City bears liability because its policies, practices and/or customs caused Plaintiffs' injuries.

39.    On information and belief, Plaintiffs allege that Defendant, its agents and employees, acted pursuant to then-newly enacted Los Angeles Municipal Code ("LAMC") §56.11, which is unconstitutional on its face and as applied.

40.    On information and belief, Plaintiffs allege that Defendant City maintains that notices are not required to be posted prior to conducting "compliance" checks to determine that all of the provisions of LAMC §56.11 are being met, including but not limited to "health and safety", the 60-gallon bag limit for property, "bulky items" removal and all other terms of LAMC §56.11.

41.    Whether through the enforcement of §56.11 or otherwise, over the course of nearly 20 years, the City of Los Angeles and its officials have a policy, practice, or custom of conducting sweeps for the purpose of confiscating and immediately destroying the property of homeless individuals who have no place to live other than the sidewalks because of the lack of shelter in Los Angeles.

42.    The City of Los Angles failed to provide adequate training and supervision to its employees with respect to constitutional rights involving seizure of personal property and due process of law.

43.    The Defendant City was on notice of the unlawfulness of their actions based on previous legal actions brought against the City for nearly identical operations in the Skid Row area, including the decision of the Ninth Circuit in *Lavan v. City of Los Angele*s, 693 F.3d 1022 (2012), as well as two earlier lawsuits in Venice, including one in the exact same location.  Just one year prior to the events giving rise to this action, the Defendant City was enjoined by the District

Court from engaging in the very conduct on Skid Row that is complained of herein. *See Mitchell v. City of Los Angeles*, 2:16-cv-01750 SJO (C.D. CA 2016).

## CLASS ALLEGATIONS

44.     The claims set forth in this action are brought by the class representatives on their own behalf and on behalf of all of those similarly situated pursuant to Fed. R. Civ. P. 23(b)(3) for declaratory relief and damages.

45.     The putative class includes approximately 60 individuals who resided in the area of 3rd Avenue and Rose Avenue, in the Venice neighborhood at the time that this incident occurred.  Each member of the class had most or all of his or her personal property taken and destroyed on the morning of September 15, 2017.

46.     **Numerosity**:  The members of the class are so numerous that individual joinder of all members is impracticable, if not impossible.  Plaintiffs are informed and believe that members of the class total 60 individuals, it not more.

47.     **Commonality**:  There are common questions of law and fact that predominate over any issue affecting only individual class members.  The violations of the class members' rights arise from a common set of facts and a common and deliberate plan of Defendants to confiscate and destroy personal property of members of the putative class.  These include the following:

    a)     whether the Defendant City's policies, practices, and/or custom of seizing homeless individuals' property without prior notice or the opportunity to recover essential possessions before they are destroyed violated and continue to violate Plaintiffs' constitutional rights; and

    b)     whether the Defendant City's policies, practices, and/or custom seizing homeless individuals' property without prior notice or the opportunity to recover vital personal possessions before they are destroyed violated and continue to violate Plaintiffs' federal statutory rights and state statutory rights.

48. **Typicality**:  The claims of the named Plaintiffs, as the representative parties, are typical of the claims of the class members with respect to the constitutionality and legality of the Defendant City's policies, practices, and conduct at issue here.  The named class representatives' claims arise from the same incident on September 15, 2017 as the absentee class members' claims.  The prosecution of individual actions against the City by individual class members would create a risk of inconsistent and varying adjudications.

49. **Adequacy**:  The named Plaintiffs will fairly and adequately protect the interests of the class.  The class representatives have no interests that are adverse or antagonistic to those of other class members.  Plaintiffs' Class Counsel will also adequately represent the class.  Plaintiffs' Counsel Carol Sobel is an experienced litigator with more than 30 years of practice as a civil rights attorney.  She is experienced in class action litigation, the issues raised by this action, as well as related issues of police enforcement against homeless persons in Los Angeles.

50. **Notice to the Proposed Class**:  Plaintiffs' counsel is in contact with groups and individual advocates for homeless persons who, in the course of providing services to homeless individuals in the City, can assist in notifying and identifying class members in this action.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

51. Claims were timely filed with the Defendant **CITY** pursuant to Cal. Govt. Code § 910 on March 15, 2018.  The claims were denied on April 23, 2018.

### FIRST CAUSE OF ACTION
**Right to Be Secure from Unreasonable Seizures**
**Fourth and Fourteenth Amendments (42 U.S.C. § 1983)**
**California Constitution, Art. 1, § 13**

52. Plaintiffs reallege and incorporate the allegations set forth in the proceeding paragraphs as though fully set forth herein.

53.     Defendant **CITY** and its employees and agents violated Plaintiffs'
Fourth Amendment right to be free from unreasonable seizure of their property by
confiscating and then destroying Plaintiffs' property without a warrant.

54.     These unlawful actions were done with the specific intent to deprive
Plaintiffs' of their constitutional right to be secure in their property.

55.     Plaintiffs are informed and believe that the acts of the Defendant
**CITY** and its employees and agents were intentional in failing to protect and
preserve Plaintiffs' property and that, at a minimum, were deliberately indifferent
to the likely consequence that the property would be seized and destroyed
unlawfully, even though the right at issue was well-established at the time.

56.     As a direct and proximate consequence of these unlawful acts,
Plaintiffs have suffered and continue to suffer loss of their personal property, pain
and suffering, and are entitled to compensatory damages.

### SECOND CAUSE OF ACTION
**Right to Due Process of Law**
**Fourteenth Amendment (42 U.S.C. § 1983)**
**California Constitution, Art. 1, § 7**

57.     Plaintiffs reallege and incorporate the allegations set forth in the
proceeding paragraphs as though fully set forth herein.

58.     Defendant City and its employees and agents owed a duty to Plaintiffs
under the due process clause of the Fourteenth Amendment to provide Plaintiffs
with adequate notice that their personal property was at risk of being seized and/or
destroyed, and to preserve that property or provide adequate means of reclaiming it
in a timely manner.

59.     Plaintiffs are informed and believe that the acts of the Defendant City
and its employees and agents were intentional in failing to protect and preserve
Plaintiffs' property and that, at a minimum, were deliberately indifferent to the
likely consequence that the property would be seized and destroyed unlawfully,

without the opportunity to reclaim it in a timely manner, even though the right at issue was well-established at the time.

60.     As a direct and proximate consequence of these unlawful acts, Plaintiffs have suffered and continue to suffer loss of their personal property, pain and suffering, and are entitled to compensatory damages for their property and personal injury.

### THIRD CAUSE OF ACTION
**Violation of Title II – Americans with Disabilities Act (ADA)**
**42 U.S.C. § 12101 et seq.**

61.     Plaintiffs reallege and incorporate the allegations set forth in the proceeding paragraphs as though fully set forth herein.

62.     Title II of the ADA provides in pertinent part: "[N]o qualified individual with a disability shall, by reason of such disability, be denied the benefits of services, programs, or activities of a public entity, or be subjected to discrimination by such entity."  42 U.S.C. § 12132.

63.     At all times relevant to this action, Defendant, its employees, and agents, were public entities within the meaning of Title II of the ADA and provided programs, services, or activity to the general public.

64.     At all times relevant to this action, Plaintiff **COOLEY**, and all similarly situated class members, were qualified individuals with one or more disabilities within the meaning of Title II of the ADA and met the essential eligibility requirements under Title II.  As required by federal law, Defendant conducts annual Point-in-Time ("PIT") counts of people experiencing homelessness in the City and, on the basis of information collected in the PIT by the Los Angeles Homelessness Services Authority (LAHSA), a joint powers authority for the City and County of Los Angeles, Defendant is aware that nearly half of people experiencing homelessness in the City have one or more disabilities

that require reasonable accommodations for compliance with City policies, practices and customs.

65.     Defendant's policies and practices in seizing and remotely storing or outright destroying Plaintiffs' essential papers, modes of transportation, and other important items without allowing Plaintiffs who are disabled extra trips and time to gather property and without allowing Plaintiffs who are disabled to keep property essential to treat and relieve Plaintiffs disabilities such as: medical documents, nutritional supplements, and cargo carrying mobility devices—violate Plaintiffs' rights on the basis of their disabilities.  28 C.F.R. § 35.130(b)(3).

66.     Even if Defendant acted pursuant to a facially neutral policy, the acts of Defendant, its agents and employees, violates the rights of unhoused persons with disabilities because Defendant's policies unduly burden disabled individuals. Plaintiff COOLEY and all other disabled persons in the putative class are entitled to an accommodation for their disability even if the Defendant consistently enforces the policy against all unhoused persons.

67.     The acts and omissions complained of herein subjected Plaintiffs to discrimination on the basis of their disabilities, in violation of Title II of the ADA. By not allowing Plaintiffs additional trips Defendants subjected plaintiffs to unjust or prejudicial treatment by denying Plaintiffs the kind of access to their property that non-disabled persons had.

68.     Also, by not allowing Plaintiffs to save property necessary to treat or relieve disabilities, Defendants subjected Plaintiffs to unjust or prejudicial treatment.  Defendants put Plaintiffs in a fundamentally worse position than a non-disabled person because Plaintiffs were forced to manage their disability without the items needed to treat or alleviate their disability—an experience a non-disabled person would not have since they had no disability to treat or alleviate.

69.     Defendants knew, or should have known, that the incidence of disabilities for people who are homeless is extremely high, with estimates as great

FIRST AMENDED COMPLAINT

as 40 to 50 percent of homeless individuals suffering from some significant mental, medical, or physical disability, and many suffering from compound disabilities.

70.    On information and belief, several plaintiffs explained their disability and requested modification for their disability in the form of additional time and trips to gather items that were necessary to treat or manage their disability and LAPD refused to make those modifications, despite the fact that the additional time and trips would not fundamentally alter the program, service, or activity of street and sidewalk cleaning as sweeps are an activity that takes place over the course of several hours.

71.    On information and belief, critical personal papers and other essential property should have been returned to individuals with disabilities or at a minimum stored in a location that was accessible to an individual with disabilities.

72.    As a public entity, Defendants are required to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability" where, as here, modifications would not "fundamentally alter the nature of the service, program or activity." 28 C.F.R. § 35.130(b)(7).

73.    This includes the need to make reasonable accommodations to protect the essential life-protecting and mobility assistive property of persons who are homeless, as well as provide prompt and reasonable access to ensure that individuals are able to recover seized property.  The policies, practices, and procedures challenged in this action, even if otherwise facially neutral, unduly burden persons who are disabled who are without shelter and within the federal definition of homeless.  The location of the only storage facility at a distance of more than 20 miles failed to provide any accommodation, let alone a "reasonable accommodation" to a population known to have a high percentage of individuals experiencing disabilities and, often, compound disabilities.

74.     Defendant, its employees and agents, knew or should have known of Plaintiffs' disabilities and acted with intent and/or reckless disregard for the rights of Plaintiffs by refusing to make reasonable modifications so that the Plaintiffs who are disabled could have access to essential property which was required to treat or alleviate Plaintiffs' various disabilities.

75.     Plaintiffs are informed and believe that Defendant and its agents and employees have failed and continue to fail to adopt and enforce adequate policies and procedures for interacting with homeless individuals with disabilities.

## FOURTH CAUSE OF ACTION
### Violation of Unruh Civil Rights Act
### Cal. Civ. Code § 51

76.     Plaintiffs reallege and incorporate the allegations set forth in the proceeding paragraphs as though fully set forth herein.

77.     California Civil Code 51 et seq. provides in pertinent part that: "All persons within the jurisdiction of this state are free and equal, and no matter what their … disability … are entitled to the full and equal … privileges, or services in all business establishments of every kind whatsoever."

78.     Defendant, through its agents and employees in the LAPD and Public Works, is a "business establishment" within the meaning of § 51.

79.     The acts and omissions complained of herein denied Plaintiff **COOLEY** and similarly situated class members of the right to be free from discrimination on the basis of a disability and were done with intent or reckless disregard for their rights as disabled individuals.

80.     As a direct and proximate consequence of these unlawful acts, Plaintiff **COOLEY** and all similarly situated class members have suffered and continue to suffer loss of their statutory rights and are entitled to statutory damages pursuant to California Civil Code §§ 52 and 52.1.

FIRST AMENDED COMPLAINT

## FIFTH CAUSE OF ACTION
### Violation of Bane Civil Rights Act
### Cal. Civ. Code § 52.1

81.     Plaintiffs reallege and incorporate the allegations set forth in the proceeding paragraphs as though fully set forth herein.

82.     Defendant's agents and employees used threats of arrest and assault when Plaintiffs and other class members sought to recover their property from Rose Avenue.  In at least one instance, actual force was applied to a member of the Plaintiff class as she attempted to assist a severely disabled individual reclaim his property, which was observed by other Plaintiffs.  The threats and intimidation were done to prevent Plaintiffs from exercising their rights to maintain their personal possessions as secured by the Constitution of the United States, the Constitution of the State of California, and the statutory laws of California.

83.     Based upon seeing Defendant's agents and employees use arrests, threats of arrest, threats of force and actual force to interfere with attempts by unhoused persons to save their property, Plaintiffs reasonably believed that they would be assaulted or arrested if they continued to insist on enforcing their rights.

84.     As a result, Plaintiffs and class members abandoned attempts to salvage their essential property before it was summarily and irrevocably destroyed.

85.     As a direct and proximate consequence of these unlawful acts, Plaintiffs have suffered and continue to suffer loss of their statutory rights and are entitled to statutory damages pursuant to California Civil Code §§ 52 and 52.1.

## SIXTH CAUSE OF ACTION
### Violation of Cal. Civ. Code § 2080 et seq.

86.     Plaintiffs reallege and incorporate the allegations set forth in the proceeding paragraphs as though fully set forth herein.

87.     Defendant's policies, practices, and conduct challenged herein violated California Civil Code § 2080 et seq., in that Defendant's agents and

FIRST AMENDED COMPLAINT

employees failed to protect and preserve Plaintiffs' personal property when the property was on the public sidewalk, failed to provide written notice that the property would be taken, and failed to provide post-deprivation notice so that Plaintiffs would have the opportunity to reclaim it within a reasonable time.

88.    Cal. Civ. Code § 2080 et seq. imposes a mandatory duty on public agencies to maintain property that is not abandoned for a minimum of 90 days.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs prays as follows:

1.    For a declaratory judgment that Defendant's policies, practices and conduct as alleged herein violated Plaintiffs' rights under the United States and California Constitutions and the statutory laws of the United States and California;

2.    For damages according to proof and on the basis of statutory amounts recoverable under California law for the loss of Plaintiffs' property, the violation of their constitutional rights, and for pain and suffering resulting from the unlawful conduct of Defendant, its agents and employees;

3.    For costs of suit and attorney fees as provided by law;

4.    For such other relief as the Court deems just and proper.


Dated: May 22, 2019              Respectfully submitted,

                                 LAW OFFICE OF CAROL A. SOBEL


                                    /s/ Monique A. Alarcon
                                 By:  Monique A. Alarcon
                                 Attorneys for Plaintiffs